UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RENEE COBB**,<br><br>Plaintiff,<br><br>v.<br><br>**HUNG CAO, ACTING SECRETARY OF THE NAVY**,<br><br>Defendant. | Civil Action No. 20-cv-3015 (TSC) |

**MEMORANDUM OPINION**

Plaintiff Renee Cobb brings this action against Defendant Hung Cao in his official capacity as Acting Secretary of the Navy, alleging unlawful employment discrimination, retaliation, and hostile work environment on the bases of race, sex, color, and age in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-16, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 633a, as well as disability discrimination in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791.[1] The court granted in part and denied in part Defendant's motion to dismiss, ECF Nos. 55, 56, and Defendant now moves for summary judgment on Plaintiff's remaining claims, ECF No. 63. For the reasons explained below, Defendant's motion will be GRANTED in part and DENIED in part.

## I. BACKGROUND

### A. Plaintiff's Employment and Supervisors

Plaintiff, a Black woman over 40 years old, joined the Navy in April 2010 as a General

[1] Hung Cao became Acting Secretary of the Navy on April 22, 2026, and is automatically substituted as Defendant under Federal Rule of Civil Procedure 25(d).

Engineer at the Naval Sea Systems Command ("the Command"). Def.'s Statement of Undisputed Material Facts ("Def.'s SMF") ¶ 1, ECF No. 63-2. Until late September 2016, she worked on Virginia-class systems in the Command's Electrical Section, Def.'s Ex. A (EEOC Hr'g Tr.) at 15:13–16, ECF No. 63-3, a position that required a security clearance, Def.'s SMF ¶ 55.

Plaintiff reported to a succession of supervisors over her 14 years at the Command. When she arrived, Matthew Schmidt was her second-level supervisor; he retired in March 2015 and was succeeded by Robert Bassett. Def.'s Ex. C (Report of Investigation ("ROI")) at 7–8, 21, ECF No. 65-1.[2] Marc DeAngelis, who had been Plaintiff's co-worker since 2010, became her first-level supervisor in October 2015 and served in that role until September 2016. *Id.* at 194. In late September 2016, Katherine Brock became Plaintiff's first-level supervisor and Crawford Henderson her second-level supervisor. *Id.* at 8, 1390. Charles Fink served as Plaintiff's first-level supervisor from March 2018 through July 2019. Def.'s Ex. T (Fink Decl.) ¶¶ 1–2, ECF No. 63-20.

### B. Schmidt Allegations

Plaintiff alleges that between 2011 and 2014, Schmidt insulted and physically abused her, including by pouring hot coffee on her in front of male colleagues, telling her to take her head out of the "Virginia Class bubble," and calling her "stupid." Def.'s Ex. Q (2024 Cobb Tr.) at 51:16, 55:2–3, ECF No. 63-17. Defendant claims Schmidt has a disability causing physical instability

[2] Plaintiff objects that the ROI "was not properly lodged" and that "ROI-dependent assertions cannot establish undisputed facts." Pl.'s Opp'n at 2, ECF No. 70. The court already determined that the ROI was properly filed. *See* Min. Order, Oct. 8, 2025. And Plaintiff's Rule 56(c)(2) objection falls short because at this stage, the court asks only whether the evidence is "capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000); *see* Fed. R. Civ. P. 56(c)(2). It is. The affidavits can be offered through live witnesses and the agency records through a custodian, and the travel-investigation findings are considered not for their truth but as the basis on which the deciding officials acted.

and that the coffee spill was accidental. ROI at 959. Plaintiff testified that it was intentional—that Schmidt's impairment affected his legs and feet rather than his hands, 2024 Cobb Tr. at 53:17-19, and that Schmidt placed the cup on a ledge while "tilting" it toward her and then "pushed the coffee" and "smirked," *id.* at 51:20-24, 55:22-23. In October 2013, Plaintiff and Schmidt participated in a voluntary informal mediation with a certified mediator. ROI at 957. Plaintiff took no EEO action concerning Schmidt before February 2016, roughly eleven months after his retirement. Def.'s Ex. S (2016 and 2019 EEO Compls.) at 7, ECF No. 63-19.

### C. DeAngelis Allegations

Plaintiff alleges that DeAngelis told her, five or six times while she was under his supervision, "I'm going to make you pay for being a Black female now that I have the authority to do so." Am. Compl. at 14, ECF No. 5; Def.'s Ex. B (2019 Cobb Tr.) at 107:7–108:2, ECF No. 63-4; EEOC Hr'g Tr. at 24:7–12. Plaintiff declares that these comments were "threatening, discriminatory, and made in the context of work-related tensions," and that she reported the conduct internally without any remedial response. Cobb Decl. ¶ 3, ECF No. 70-2. Plaintiff's March 2016 EEO pre-complaint intake form cites additional statements from DeAngelis, including that her "Performance Appraisal will drop to an unacceptable." 2016 EEO Compl. at 10.

### D. 2015 Hawaii Assignment and Travel Card Suspension

Plaintiff was approved to travel to Hawaii on temporary duty from March 11 to 19, 2015. Def.'s Ex. F (CBCA Op.) at 1–2, ECF No. 63-6. After Plaintiff reported that her March 19 return flight was scheduled to depart too early to finish her work, Henderson authorized her to remain an extra day. *Id.* at 2. Plaintiff did not return until March 23—three days after the authorized extension—charging additional accommodation costs to the government. Def.'s SMF ¶ 30; CBCA Op. at 3. She explains that her late departure resulted from flight availability and cancellations

outside her control, and that her supervisor instructed her not to pay a premium to secure an earlier flight. 2024 Cobb Tr. at 68:9–20. Command investigators concluded that Plaintiff gave "misleading and contradictory statements" during the ensuing travel-voucher investigation, Def.'s SMF ¶ 31; ROI at 386–87, 918; though the Civilian Board of Contract Appeals later determined that it could not "find, based upon the existing record, that . . . Cobb made any intentional misrepresentations," CBCA Op. at 7.

The same year, Plaintiff's government travel card was suspended after she failed to pay the balance within 60 days. 2024 Cobb Tr. at 58:5–8; ROI at 966. The card was reinstated, and Plaintiff used it to attend a training in Connecticut in December 2015. ROI at 592–93. Between March 2015 and February 2017, Plaintiff submitted one travel request for the training, and it was approved. *Id.* at 364.

**E. 2016 Storage Violation and Letter of Reprimand**

In February 2016, Bassett reminded his team that "Confidential material cannot be left unattended at your desk—not in a drawer, not in an overhead, nowhere," and announced that "there will be a spot check in the near future to ensure compliance." ROI at 1060. When Bassett conducted the spot check the next day, he observed confidential documents improperly stored in Plaintiff's unsecured cubicle. *Id.* at 1025–26. Plaintiff attested in 2019 that she understood the importance of securing classified material and should have secured her cabinets. *See* 2019 Cobb Tr. at 85:9–19. In her declaration opposing summary judgment, she maintains that the cabinet lock was broken and incapable of securing its contents. Cobb Decl. ¶ 6. She also identifies two colleagues who she claims mishandled material without consequence: Farzana Chowdhury, who in April 2016 left confidential material on Plaintiff's desk, and Amy Bryant, who in June 2019 left a binder designated as Not Releasable to Foreign Nationals there. Cobb Decl. ¶ 8; Pl.'s Exs. 14–

15, ECF Nos. 70-21–22.

In April 2016, following an investigation of both the Hawaii travel and the stowage incident, Bassett issued Plaintiff a letter of reprimand citing her failure to depart Hawaii on the authorized date, inaccurate accounting of the trip, improperly stored confidential documents, and failure to take responsibility for the security violations. ROI at 1025–26.

**F. 2016 Performance Evaluations**

DeAngelis initially rated Plaintiff "unacceptable" on her 2016 interim evaluation based on her handling of classified information, but revised her rating to "acceptable" after learning that the rating standards precluded such a rating on those facts. EEOC Hr'g Tr. at 116:6–117:6. For her 2016 year-end evaluation, DeAngelis gave her an overall contribution score of 84 against an expected score of 85 for her salary level. ROI at 1250. Under the Command's compensation system, a score below the expected figure bears directly on an employee's pay because it means the employee is compensated above the level her contribution warrants. *Id.* at 1224. In his review, DeAngelis explained that some of her deliverables and communications "required rework"; that she did not "possess the technical and managerial skills necessary to support, direct and supervise other engineers as they deal with complex problems"; and did not set a good example when it came to compliance with office policies. *Id.* at 1252–53. Plaintiff's second-level supervisor at the time, Henderson, described the rating as "a fair assessment of [Plaintiff's] performance for the rating period." *Id.* at 1369.

**G. 2016 Clearance Revocation and 2017 Restoration**

In October 2016, Plaintiff received a letter of intent to revoke her eligibility for a security clearance from the Department of Defense Consolidated Adjudications Facility; in December 2016, her clearance was revoked. ROI at 1200. Because she could not perform her duties without

a clearance, Henderson placed her on paid administrative leave on January 9, 2017. *Id.* at 1208. Her clearance was restored and she returned to duty on January 23. *Id.* at 1378–79.

**H. March 2019 Laptop Incident and the Drumbeat Reassignment**

On March 11, 2019, Plaintiff traveled to Florida with her government-issued laptop for work-related training. *See* 2024 Cobb Tr. at 109:21–110:6; Def.'s SMF ¶¶ 57–58. While deplaning, Plaintiff realized that her laptop was missing. *Id.* at 110:7–8. Plaintiff notified the flight attendant, who "said someone must have taken it by mistake." *Id.* at 110:9–10. Plaintiff filed a claim with the airline, directing that the laptop be released only to her. Def.'s Ex. G at 1, ECF No. 63-7.

On March 12, Fink informed Plaintiff that a Command agent would collect the laptop the following day. Def.'s Ex. H at 10, ECF No. 63-8. Plaintiff asked whether the airline would release it to the agent, and Fink answered that he expected so given the asset tag and serial numbers. *Id.* at 11. On March 13, after the agent was turned away, Chief of Staff Margaret Zuanich-Bunker emailed Plaintiff and asked her to have the release restriction lifted. Def.'s Ex. I, ECF No. 63-9. Plaintiff did not contact the airline about the laptop; the next time she called the airline was on March 15 to ask about personal belongings. 2024 Cobb Tr. at 129:2–6; Def.'s Ex. G at 2.

Around the same time, Plaintiff was removed from her informal duties supporting the "Drumbeat" meetings. Fink Decl. ¶ 6. At those meetings, Command leadership "received reports on the progress made and provided direction concerning a special project." *Id.* ¶ 3. Plaintiff's role, which was collateral to her engineering duties, was "to take notes and record action items during the meetings." *Id.* ¶¶ 4, 5. In April 2019, Fink reassigned Plaintiff from those duties, citing her "difficulty completing routine tasks," including "updating the action items tracker" and "drafting and routing official correspondence," and explaining that Plaintiff's work product

"routinely required numerous corrections." *Id.* ¶ 6. Plaintiff disputes that characterization, noting that she was never counseled or placed on a performance plan for the task, that she performed duties as directed, and attributing any delay to shifting leadership inputs and undefined workflows. Cobb Decl. ¶ 18.

### I. 2019 Security Actions and 2024 Removal

On July 11, 2019, following an investigation, Fink proposed a five-day suspension without pay for Plaintiff's failure to maintain control of her laptop, her interference with its retrieval, and her lack of candor during the investigation. Def.'s Ex. J at 1–2, ECF No. 63-10. On August 15, the Command's Security Director issued a notice of intent to suspend access to classified information due to Plaintiff's "failure to properly handle protected national security information through the loss of control of a laptop computer containing sensitive Controlled Unclassified Information (CUI), [and] Naval Nuclear Propulsion Information (NNPI)." Def.'s Ex. K at 1, ECF No. 63-11. As a result, Defendant placed her on paid administrative leave on August 19 and indefinitely suspended her without pay on November 4 for failure to maintain a security clearance. Def.'s Exs. L, N, ECF Nos. 63-12, 63-14. The Merit Systems Protection Board sustained the indefinite suspension in March 2020. Def.'s Ex. R at 2, ECF No. 63-18.

In April 2024, the Command proposed removing Plaintiff for failure to maintain her security clearance, a condition of employment. Def.'s Ex. O at 2, ECF No. 63-15. On May 11, 2024, she was notified of the removal decision, effective later that month. Def.'s Ex. P at 1–2, ECF No. 63-16.

### J. Administrative and Procedural History

On February 17, 2016, Plaintiff contacted an Equal Employment Opportunity ("EEO") counselor concerning the matters underlying this case, filing a formal EEO complaint

encompassing the Hawaii investigation, the April 2016 letter of reprimand, and the 2016 performance evaluation. *See* 2016 EEO Compl. at 2. Following the March 2019 laptop incident, Plaintiff filed a second formal EEO complaint on April 24, 2019, covering the subsequent security and personnel actions. *See* 2019 EEO Compl. at 13. An EEOC Administrative Judge held a hearing on Plaintiff's 2016 and 2019 complaints in June 2020. *See* Def.'s Ex. D, ECF No. 63-5.

In October 2020, Plaintiff filed this action *pro se*, ECF No. 1, and filed an Amended Complaint the following month, ECF No. 5. Counsel entered an appearance in June 2021. ECF No. 21. In September 2023, the court granted in part and denied in part Defendant's motion to dismiss her Amended Complaint, dismissing the age-based hostile work environment claim and the retaliation claim brought under 42 U.S.C. § 1981, and otherwise allowing Plaintiff's discrimination, retaliation, and race- and sex-based hostile work environment claims to proceed. *See Cobb v. Del Toro*, No. 20-cv-3015 (TSC), 2023 WL 6215037 (D.D.C. Sept. 25, 2023) (*Cobb I*); ECF No. 37. In June 2024, Plaintiff filed a Supplemental Complaint adding allegations concerning the 2021 letter of intent to revoke her clearance, the 2023 and 2024 clearance revocations, the April 2024 notice of proposed removal, and the May 2024 removal, and adding a disability discrimination claim.[3] Suppl. Compl., ECF No. 42. In March 2025, the court granted in part and denied in part Defendant's motion to dismiss the Supplemental Complaint, dismissing for failure to exhaust the claims arising from the February 2021 letter of intent, the July 2023

[3] Plaintiff's Supplemental Complaint alleges discrimination under the Americans with Disabilities Act ("ADA"). Suppl. Compl. ¶ 10, ECF No. 42. But the ADA provides no remedy to federal employees, as "the federal government is not considered an 'employer' under the ADA." *Williams v. Brennan*, 285 F. Supp. 3d 1, 7 (D.D.C. 2017) (quoting *Ahmed v. Napolitano*, 825 F. Supp. 2d 112, 115 (D.D.C. 2011)). The court therefore construes the Supplemental Complaint as asserting a claim under the Rehabilitation Act, which is "the exclusive remedy for federal employees alleging disability discrimination." *Welsh v. Hagler*, 83 F. Supp. 3d 212, 222 (D.D.C. 2015); *see* 42 U.S.C. § 12111(5)(B)(i); 29 U.S.C. § 791.

eligibility revocation, and the March 2024 clearance revocation, and dismissing the supplemental hostile work environment claim. *See Cobb v. Del Toro*, No. 20-cv-3015 (TSC), 2025 WL 858795 (D.D.C. Mar. 19, 2025) (*Cobb II*); ECF No. 55.

The claims that remain relate to Schmidt's alleged insults and physical abuse between 2011 and 2014; DeAngelis's "pay for being a Black female" statement; the 2015 denial of Hawaii travel and suspension of her government travel card; the April 2016 letter of reprimand and 2016 year-end performance evaluation; the December 2016 revocation of her security clearance and resulting January 2017 administrative leave; the April 2019 removal of her Drumbeat meeting duties; the July 2019 proposed five-day suspension, August 2019 notice of intent to suspend her access to classified information and resulting administrative leave, and November 2019 indefinite suspension; and the April 2024 notice of proposed removal and May 2024 removal.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit"; a dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party may defeat this showing by pointing to evidence in the record—more than "a scintilla"—creating a triable dispute. *Anderson*, 477 U.S. at 252. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III. ANALYSIS

### A. Title VII and ADEA Discrimination and Retaliation

"Title VII prohibits the federal government from discriminating against employees on the basis of race [or sex], 42 U.S.C. § 2000e–16(a), or retaliating against them because they opposed an unlawful employment practice or made a charge under the statute, *id.* § 2000e–3(a)." *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015). The ADEA contains a parallel provision prohibiting discrimination and retaliation based on age as to employees at least 40 years old. 29 U.S.C. § 633a(a); *see Gomez-Perez v. Potter*, 553 U.S. 474, 479 (2008) (holding that section 633a(a) covers both discrimination and retaliation claims).

When a plaintiff offers indirect evidence of discrimination, the court applies the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973): the plaintiff must first establish a prima facie case of discrimination or retaliation, after which the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the challenged action, and then back to the plaintiff to show that the employer's stated reason was but "a pretext for discrimination." *George v. Leavitt*, 407 F.3d 405, 411 (D.C. Cir. 2005) (quoting *Tex. Dep't of Cmty. Aff. v. Burdine,* 450 U.S. 248, 252–53 (1981)). "To state a prima facie case of discrimination, a plaintiff must allege she is part of a protected class under Title VII, she suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination." *Walker*, 798 F.3d at 1091. A prima facie case of retaliation requires showing that she "engaged in statutorily protected activity," "suffered a materially adverse action," and "that a

causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

But when "an employee has suffered an adverse employment action and the employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). "Assuming the employer proffers such a reason, the 'central question' at summary judgment becomes whether 'the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee.'" *Walker*, 798 F.3d at 1092 (quoting *Allen v. Johnson,* 795 F.3d 34, 39 (D.C. Cir. 2015)). In resolving that question, the court weighs "all relevant evidence presented by the plaintiff and the defendant," *Brady*, 520 F.3d at 495, including "the plaintiff's prima facie case" and "any evidence the plaintiff presents to attack the employer's proffered explanation for its action," *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 993 (D.C. Cir. 2002)). Courts look to evidence that the employer treated "similarly situated employees outside the plaintiff's protected group" better, "deviat[ed] from established procedures or criteria," *Walker*, 798 F.3d at 1092, or "is making up or lying about the underlying facts that formed the predicate for the employment decision," *Brady*, 520 F.3d at 495.[4] "[I]f the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude

[4] To the extent Plaintiff advances Schmidt's threats and coffee-spill or DeAngelis's "pay for being a Black female" statement as standalone disparate-treatment claims rather than as evidence of a hostile work environment, they are not actionable. Title VII reaches only conduct affecting an employee's "terms, conditions, or privileges of employment," *Chambers v. District of Columbia*, 35 F.4th 870, 874–75 (D.C. Cir. 2022), and offensive remarks alone effect no change in the terms or conditions of employment, *see Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024).

the employer is lying about the underlying facts." *Id.* at 496.

***1. Hawaii Travel, Suspension of Travel Card, "Drumbeat" duties***

As discussed above, claims of discrimination and retaliation against federal employees under Title VII and the ADEA require an adverse action by the employer. For discrimination claims, a plaintiff must identify "some harm respecting an identifiable term or condition of employment," *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). For retaliation claims, cognizable harm is "not limited to discriminatory actions that affect the terms and conditions of employment"; a plaintiff must show that the employer's action "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

As a preliminary matter, Defendant urges the court to treat as conceded that the limitation on Hawaii travel, suspension of Plaintiff's corporate credit card, and removal of her Drumbeat meeting duties were not adverse personnel actions, as Plaintiff does not argue otherwise. Def.'s Reply at 3–4, ECF No. 71. But a summary judgment motion "cannot be 'conceded' for want of opposition," and the burden remains on Defendant to show that judgment is warranted. *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016). The court therefore reaches each of Defendant's arguments below. But it does so without constructing arguments Plaintiff has not advanced and treats as undisputed facts Plaintiff has failed to properly address. Fed. R. Civ. P. 56(e)(2).

Neither the limitation on Hawaii travel nor the temporary suspension of Plaintiff's government-issued travel card constituted an adverse action for purposes of her discrimination or retaliation claims. Plaintiff alleges that she was "not allowed to travel to Hawaii" for work after March 2015, Am. Compl. at 10, but travel to Hawaii was not part of Plaintiff's position description,

ROI at 360–61, 593, no-one from her branch traveled there during the period in question, 2024 Cobb Tr. at 63:3–6; ROI at 361, and Plaintiff submitted no subsequent travel requests, ROI at 364. Plaintiff's government-issued travel card was suspended after she failed to pay her balance within the allotted time—a task she acknowledges was her responsibility. 2024 Cobb Tr. at 58:5–8, 14–21; ROI at 966. It was reinstated in time for her December 2015 training travel, and the single travel request she submitted during the relevant window was approved. ROI at 364, 592–93.

As to the reassignment of Plaintiff's "Drumbeat" meeting notetaking duties, she points to no effect on her pay, grade, duties, or advancement or other material harm. Her assertion that reassignment cost her "visibility," Pl.'s Opp'n at 4, is not tied to any identifiable term or condition of employment; nor is it serious enough to "dissuade a reasonable worker from making or supporting a charge of discrimination," *Burlington N.*, 548 U.S. at 57. And in any case, Fink articulated a facially legitimate, nondiscriminatory reason for the reassignment: consistent with DeAngelis and Henderson's previous assessments, ROI at 1252–54, 1369, Fink determined that Plaintiff was "ineffective in accomplishing her responsibilities," "had difficulty completing routine tasks," and that her drafts "routinely required numerous corrections," Fink Decl. ¶ 6. While Plaintiff "dispute[s] this characterization," Cobb Decl. ¶ 18, she offers no evidence that Fink disbelieved these reasons and that they were merely a cover for a discriminatory motive.

Summary judgment is therefore appropriate as to Plaintiff's discrimination and retaliation claims based on her Hawaii travel, the suspension of her travel card, and her "Drumbeat" duties.

***2. Letter of Reprimand***

As to the letter of reprimand, Plaintiff fails to identify evidence from which a reasonable jury could conclude that Defendant's facially legitimate reasons were pretextual. The reprimand cites Plaintiff's three-day overstay past the authorized extension of her Hawaii trip and inconsistent

accounting of the trip to investigators, as well as her failure to safeguard classified information after confidential documents were found improperly stored in her cubicle. ROI at 1025–26. Plaintiff does not deny that she remained in Hawaii until March 23, 2015, past her authorized departure date, 2024 Cobb Tr. at 67:6–11, or that the confidential materials were in her cubicle on February 12, 2016, Pl.'s Resp. to Def.'s SMF ¶¶ 30, 38, 40–41. She instead offers context, noting that Schmidt's retirement left her without transition support in Hawaii, that the cabinet lock was broken, that the reprimand improperly "bundled" the voucher and storage matters, that other employees mishandled materials without discipline, and that the Civilian Board of Contract Appeals ruled partly in her favor on the voucher matter. Cobb Decl. ¶¶ 5–7. She attributes her late departure to flight availability and cancellations and to her supervisor's instruction not to pay a premium for an earlier flight. 2024 Cobb Tr. at 67:14–24.

None of this raises a triable dispute as to whether the reprimand was a product of discrimination or retaliation. Her claim that she lacked support is difficult to square with her testimony that the extension itself was authorized, 2024 Cobb Tr. at 67:14–15, and flight-scheduling difficulties do not change the fact that she departed after the authorized date. As to her broken cabinet lock, Bassett's email directed that confidential material could not be left unattended in any form—"not in a drawer, not in an overhead, nowhere." ROI at 1060. The "bundling" objection is refuted by the reprimand itself, which separately addressed the two charges and expressly acknowledged the Board's decision and its partial restoration of travel compensation. ROI at 1026. The Board's refusal to find intentional misrepresentation in the voucher investigation does not necessarily show that Bassett disbelieved the Command's other investigative findings or that his reliance on them was a mere pretext for unlawful discrimination. *See Brady*, 520 F.3d at 496; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to

be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.").

Plaintiff points to Chowdhury and Bryant as comparators, Cobb Decl. ¶ 8, but neither was similarly situated. The reprimand rested on two charges—the travel voucher misconduct and the security violation—and neither comparator was subject to a travel-related charge. Bryant's conduct also occurred years later under a different supervisor. Pl.'s Ex. 15 at 1, ECF No. 70-22. "[C]omparators must have been charged with offenses of comparable seriousness and all of the relevant aspects of their employment situations must have been nearly identical." *Burley v. Nat'l R.R. Passenger Corp.*, 33 F. Supp. 3d 61, 73 (D.D.C. 2014) (cleaned up). The comparator evidence therefore does not permit a reasonable jury to infer pretext.

Summary judgment will be granted as to Plaintiff's discrimination and retaliation claims based on the letter of reprimand.

***3. Contribution Score***

For Plaintiff's 2016 year-end evaluation, DeAngelis assigned her an overall contribution score of 84, one point below the expected figure of 85. Performance evaluations that "could affect [an employee's] position, grade level, salary, or promotion opportunities" constitute adverse actions. *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008). The 2016 contribution score qualifies: the score was tied to compensation and formally indicated that Plaintiff's contribution did not warrant the compensation she received. ROI at 1224.

Plaintiff has produced direct evidence that this rating was a product of race and sex discrimination: DeAngelis repeatedly told her he would make her "pay for being a Black female now that [he had] the authority to do so." Am. Compl. at 14; Def.'s Ex. B (2019 Cobb Tr.) at 107:7–108:2; EEOC Hr'g Tr. at 24:7–12. Direct evidence of discriminatory intent renders the

*McDonnell Douglas* framework unnecessary because such "evidence will 'generally entitle a plaintiff to a jury trial.'" *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (quoting *Vatel v. All. of Auto. Mfrs.,* 627 F.3d 1245, 1247 (D.C. Cir. 2011)). Such evidence includes "expressions by the decision maker that [provide] evidence of discriminatory intent without any need for inference," *Francis v. Perez*, 970 F. Supp. 2d 48, 62 (D.D.C. 2013), such as a "statement that itself shows racial or gender bias in the decision," *Vatel*, 627 F.3d at 1247.

DeAngelis's statement does exactly that. It expressly references Plaintiff's race and sex, declares an intent to penalize her on that basis, and ties that intent to the authority he had just acquired—"now that he had the authority to do so." 2024 Cobb Tr. at 33:16. He made the statement as Plaintiff's supervisor, and the challenged evaluation was the first and only annual contribution score he assigned her in that role. On this record, a reasonable jury could find that DeAngelis's stated intent to make Plaintiff "pay" because she was a Black woman was carried out in the below-expectations rating he gave her.

Defendant counters with a statement from Henderson—a Black man over 50—that "the rating provided by Mr. DeAngelis is a fair assessment of [Plaintiff's] performance for the rating period." ROI at 1369. But Henderson was not Plaintiff's rater, DeAngelis was. *Id.* at 1250. And unlike DeAngelis, whose supervision spanned the entire rating year, Henderson did not begin supervising Plaintiff until the rating period was nearly over. *Id.* at 1390. His endorsement was not a contemporaneous review, but affidavit testimony offered months later during the EEO investigation. *Id.* at 1369. A post hoc endorsement by an official who supervised Plaintiff for only a matter of weeks does not eliminate the factual dispute over DeAngelis's motivation.

Defendant also notes that Plaintiff failed to report DeAngelis's statement until her 2019 deposition. Mot. for Summ. J. at 35, ECF No. 63. That delay may bear on Plaintiff's credibility

and ultimately persuade a jury, but "credibility determinations" and "weigh[ing] the evidence" are not the functions of a judge at summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Plaintiff is therefore entitled to a trial on her claim that her 2016 review was the product of unlawful discrimination.

Plaintiff's retaliation claim stands on different footing. The rating occurred more than seven months after Plaintiff's February 2016 EEO contact—too long a gap to support an inference of causation based on timing alone. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citing cases holding that three- and four-month gaps were insufficient to establish causation based on temporal proximity). Moreover, although DeAngelis's statement supports a triable discrimination claim, it reflects an intention he formed upon becoming Plaintiff's supervisor in October 2015, months before her February 2016 EEO contact. That evidence undermines any inference that the rating was retaliatory. *See Salak v. Pruitt*, 277 F. Supp. 3d 11, 22 (D.D.C. 2017) (explaining that causation is defeated where the employer was merely proceeding "along lines previously contemplated"); *Batson v. Powell*, 912 F. Supp. 565, 576 (D.D.C. 1996) (declining to infer causation where the alleged harassment and hostile work environment predated the plaintiff's protected activity).

The court will therefore deny summary judgment as to Plaintiff's race and sex discrimination claim based on the contribution score but grant it as to her retaliation claim. It will also grant summary judgment insofar as she alleges age discrimination; DeAngelis's statement makes no reference to age, and Plaintiff has identified no circumstantial evidence suggesting that her age bore on the rating.

***4. Five-Day Suspension in 2019***

A suspension without pay plainly qualifies as an adverse action for purposes of Plaintiff's

discrimination and retaliation claims; it both inflicts "harm respecting an identifiable term or condition of employment," *Muldrow*, 601 U.S. at 354–55, and "could well dissuade a reasonable worker from making or supporting a charge of discrimination," *Burlington N.*, 548 U.S. at 57. Fink articulated legitimate, non-discriminatory reasons for the suspension: Plaintiff's failure to maintain control of her government-issued laptop, her interference with its retrieval, and her lack of candor during the ensuing investigation. Def.'s Ex. J at 1–2.

The question, then, is whether Plaintiff has produced evidence from which a reasonable jury could find that those reasons were not the actual reasons for the suspension and that Fink instead acted with discriminatory or retaliatory intent. *See Brady*, 520 F.3d at 494. She has not. Plaintiff disputes only the significance of the relevant events, not whether they occurred. Pl.'s Resp. to Def.'s SMF ¶¶ 65–66. She does not dispute that she instructed the airline to release the laptop only to her, Def.'s Ex. G at 1; that, when Fink told her a Command agent would retrieve it the next day, she asked whether the airline would release it but did not disclose the restriction she had placed on the device, Def.'s Ex. H at 11; Def.'s SMF ¶ 65; or that, after the agent was turned away and Zuanich-Bunker asked her to lift the restriction, she did not contact the airline about the laptop, 2024 Cobb Tr. at 130:2–7; Def.'s Ex. G at 2. In any event, the question is not "the correctness or desirability of the reasons offered . . . but whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (cleaned up). Plaintiff identifies no evidence from which a reasonable jury could find that Fink's stated reasons were a pretext for discrimination or retaliation.

Summary judgment will therefore be granted as to Plaintiff's discrimination and retaliation claims based on the five-day suspension.

***5. Security Clearance-Related Actions***

Several of the actions Plaintiff challenges—the December 2016 revocation of her security clearance and January 2017 paid administrative leave, the August 2019 notice of intent to suspend access and paid administrative leave, the November 2019 indefinite suspension without pay, the April 2024 notice of proposed removal, and the May 2024 notice of removal—were security clearance actions or direct downstream consequences of clearance actions. Because "no one has a 'right' to a security clearance," courts generally lack authority to review the merits of a clearance decision. *Dep't of the Navy v. Egan*, 484 U.S. 518, 528 (1988). Thus, courts are precluded "from resolving a discrimination claim based on an adverse employment action resulting from an agency security clearance decision." *Ryan v. Reno*, 168 F.3d 520, 523 (D.C. Cir. 1999). "[C]laims that [the agency] denied a clearance based on an impermissible motive necessarily involve reviewing the merits of [the agency's] decision, which *Egan* prohibits." *Lee v. Garland*, 120 F.4th 880, 894 (D.C. Cir. 2024) (cleaned up).

In *Rattigan v. Holder*, the D.C. Circuit recognized a narrow exception permitting a Title VII claim to proceed if the plaintiff "can show that agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false" to the agency's security division. 689 F.3d 764, 771 (D.C. Cir. 2012). This exception preserves claims based on "harm caused when a coworker fabricates security concerns in retaliation for statutorily protected activity" or because of a discriminatory animus, without which "Congress's purpose in enacting Title VII would be frustrated." *Id.* at 771.

Plaintiff invokes that exception with respect to the August 2019 notice of intent to suspend access, arguing that Command personnel falsely reported that her laptop contained both sensitive

Controlled Unclassified Information and Naval Nuclear Propulsion Information.[5] Def.'s Ex. K at 1. Plaintiff maintains that the laptop was an unclassified Navy Marine Corps Intranet ("NMCI") device incapable of processing Naval Nuclear Propulsion Information, and that it had in any event been "wiped and placed in dormant status." Cobb Decl. ¶ 10. She points to an email from Zuanich-Bunker asserting that the laptop contained Naval Nuclear Propulsion Information, Def.'s Ex. I at 1, which she juxtaposes against a June 2016 email from DeAngelis describing the computer as having been placed in "dormant status" to prevent data loss, Pl.'s Ex. 9 at 1, ECF No. 70-16, and a January 2017 email from Katherine Brock referencing an NMCI account on the computer, Pl.'s Ex. 27 at 1, ECF No. 70-41.

But this evidence does not create a genuine dispute that Plaintiff's supervisors *knew* the laptop classification information was false and nonetheless reported it to the Command's security officials. *See Webster v. Dep't of Energy*, 443 F. Supp. 3d 67, 84 (D.D.C. 2020). Zuanich-Bunker's email describing the laptop as an NNPI device is not the kind of reporting contemplated by *Rattigan*: it was sent to *Plaintiff*, not to the Command's security office. DeAngelis's 2016 "dormant status" email and the email about re-establishing the NMCI account—both predating the 2019 incident by years and addressing circumstances unrelated to the lost-laptop investigation—likewise do not create a genuine dispute that Command actors knowingly reported false information. At most, the evidence shows that Command personnel had previously referred to the

[5] Plaintiff does not appear to invoke a *Rattigan* exception as to claims arising out of the 2016 or 2024 clearance revocation decisions. Those claims are therefore barred by *Egan*. At the motion-to-dismiss stage, the court declined to dismiss Plaintiff's race- and sex-based clearance claims under *Rattigan*, reasoning that DeAngelis's statements about making her "pay" for being a "Black female" permitted an inference that he falsely blamed her for a security violation. *Cobb I*, 2023 WL 6215037, at *8. That inference was drawn on the pleadings; Plaintiff has not pressed the theory at summary judgment or identified evidence that DeAngelis knowingly made a false referral to security officials.

laptop in ways that were inconsistent with the 2019 classification, not that any Command employee knew the 2019 information was false, reported that information to security officials anyway, and did so with a retaliatory or discriminatory motive.

Consequently, summary judgment is appropriate as to Plaintiff's discrimination and retaliation claims arising from the agency's security clearance actions.

**B. Hostile Work Environment**

Title VII also prohibits employers from "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). To prevail on a hostile work environment claim, a plaintiff must show that her workplace was permeated with "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Baloch*, 550 F.3d at 1201 (cleaned up). The conduct must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). The court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Graham v. Holder*, 657 F. Supp. 2d 210, 216 (D.D.C. 2009).

Such claims are "usually characterized by a series of events that cumulatively give rise to a claim, although each individual component might not be actionable on its own." *Craig v. District of Columbia*, 881 F. Supp. 2d 26, 32 (D.D.C. 2012). But "those actions must be adequately linked such that they form a coherent hostile environment claim." *Shanks v. Int'l Union of Bricklayers & Allied Craftworkers*, 134 F.4th 585, 597 (D.C. Cir. 2025) (cleaned up). Acts are adequately linked where, for example, they "involve the same type of employment actions, occur relatively

frequently, and are perpetrated by the same managers." *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011) (cleaned up).

Plaintiff's hostile work environment claim rests on two sets of allegations. In the first, she alleges that Schmidt intentionally poured hot coffee on her, 2024 Cobb Tr. at 55:2–3; told her to get her head out of the "Virginia class bubble," *id.* at 51:16, and called her "stupid," *id.* Plaintiff testified that she understood the "Virginia class bubble" remark as a sexual and racist reference to her anatomy. 2024 Cobb Tr. at 133:3–6, 40:9–12. The second concerns DeAngelis's statement, "I'm going to make you pay for being a Black female now that I have the authority to do so." Am. Compl. at 14; 2019 Cobb Tr. at 107:7–108:2; EEOC Hr'g Tr. at 24:7–12. Plaintiff testified that DeAngelis made this comment five or six times between October 2015 and September 2016, while he was her supervisor. EEOC Hr'g Tr. at 51:19–21.

DeAngelis's statements—standing alone—carry the claim past summary judgment. A supervisor's explicit, repeated statement that he intends to make a subordinate "pay" for being a Black woman, coupled with an assertion about his authority to do it, is not a stray remark or an ordinary workplace slight. Plaintiff found these comments "threatening" and "discriminatory," and explained that they occurred in the context of "work-related tensions." Cobb Decl. ¶ 3. Indeed, DeAngelis's comment was a direct, racially and sexually targeted threat from a person with power over Plaintiff's rating, assignments, and continued employment. She reported the conduct internally to no avail, *id.*, and worked with DeAngelis for nearly a year while he repeated this comment to her. A reasonable jury could find DeAngelis's statements were sufficiently severe or pervasive as to create a hostile work environment. *Cf. Ayissi-Etoh*, 712 F.3d at 577 (recognizing that a single sufficiently severe racial epithet from a supervisor might be sufficient to establish a hostile work environment).

Because the DeAngelis statements carry the claim past summary judgment, the court need not decide whether the Schmidt allegations would independently support a hostile work environment claim, or whether that conduct is adequately linked to the DeAngelis conduct such that the two form a single coherent claim. *See Baird*, 662 F.3d at 1251; *Shanks*, 134 F.4th at 597. Summary judgment will be denied on Plaintiff's race- and sex-based hostile work environment claim.[6]

**C. Rehabilitation Act**

The Rehabilitation Act prohibits discrimination against qualified individuals with disabilities in federal employment. *See* 29 U.S.C. § 791. To succeed on a disparate-treatment theory of discrimination, a plaintiff must show "(1) that she has a disability as defined in the . . . Rehabilitation Act, (2) that she was qualified for her position, and (3) that she suffered an adverse employment action because of her disability." *Congress v. Dist. of Columbia*, 324 F. Supp. 3d 164, 169 (D.D.C. 2018). The "Act has a clear 'but-for' causation standard." *Montgomery v. McDonough*, 682 F. Supp. 3d 1, 15 (D.D.C. 2023).

Plaintiff's disparate-treatment claim rests on the allegation that the Command "perceived her as disabled" and that this perception "formed an additional basis for" her termination. Suppl. Compl. ¶ 10 n.11. She points to occasions on which she was taken from work to the hospital by ambulance, Cobb Decl. ¶ 11, and to her December 2019 diagnosis with post-traumatic stress disorder, *id.* ¶ 12; Pl.'s Ex. 4 at 1, ECF No. 70-11. But the April 2024 notice of proposed removal and the May 2024 removal rested on Plaintiff's inability to maintain the security clearance her position required, Def.'s Ex. O at 1–2; Def.'s Ex. P at 1–2, and for the reasons explained above,

[6] Plaintiff's age-based hostile work environment claim was dismissed in *Cobb I*, and the supplemental hostile work environment claim was dismissed in *Cobb II*; neither is revived here.

*Egan* bars review of the clearance determination underlying them, *see* 484 U.S. at 528. In any event, Plaintiff identifies no evidence from which a reasonable jury could conclude that any decisionmaker acted because of a perceived impairment rather than the absence of a clearance.[7]

Summary judgment is therefore appropriate as to Plaintiff's disability discrimination claim.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 63, will be GRANTED in part and DENIED in part. A separate Order will accompany this Memorandum Opinion.

Date: September 14, 2026

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

[7] To the extent Plaintiff also invokes a failure-to-accommodate theory, that theory is no longer in this case. The Amended Complaint alleged that Plaintiff was "[d]enied reasonable accommodations" by Fink. Am. Compl. ¶ 10(j). In *Cobb I*, the court found that allegation unexhausted and dismissed it, and it does not appear among the eleven allegations the court identified as remaining. 2023 WL 6215037, at *6. The claim before the court is the one pled: that the Command "perceived her as disabled," Suppl. Compl. ¶ 10 n.11, which *Cobb II* permitted to proceed as to the April 2024 notice of intent to remove her and the May 2024 termination, 2025 WL 858795, at *5.